0595 IQ Products v. WD-40 Company. Appellant, ready to proceed. Good morning. May it please the Court, my name is Nicholas Gravanti on behalf of Appellant IQ Products. I respectfully submit that this is a case in which both the law and the facts are clear. The relief we are seeking is that you reverse the District Court's January 10, 2013 order granting WD-40's motion to compel arbitration because there is no plausible argument to show arbitrability. We ask that you remand the case to the District Court for a jury trial because we believe this case is virtually trial ready. We believe there is no plausible argument in favor of arbitrability because a plain reading of the 1996 agreement on its face compels a finding that there is no plausible argument in support of arbitrability. And if there is any doubt and the Court wants to look at extrinsic evidence that was before the District Court and the magistrate judge at the time it rendered that decision, the March 12, 1996 letter from IQ to WD-40 confirms that conclusion. What is, what law, are we required to or do we turn, what does California law say about that type of extrinsic negotiating history? California says that extrinsic evidence may be considered in connection with the interpretation of a contract. May be in what circumstance? In a circumstance where the plain reading of the contract is, where it's not perhaps clear on its face. Okay. We believe this contract is clear on its face and you do not need to turn to extrinsic evidence, but California law allows you to do that in the event you believe it's not clear. And in this case, if you believe that the 1996 agreement is ambiguous and not clear on its face, you can look at that letter, which I respectfully submit is the most important and virtually the only piece of evidence before both the magistrate judge in late 92 when she issues her memo and recommendation and the district court judge in January of 2013 when in his one paragraph decision he affirms her ruling. There, all of the other evidence that has been cited to you by WD-40 was not before either the magistrate judge or the district court judge during that period. It all got introduced years later. True, but the district, I don't read the district court's order to say that it relied on the arbitrary panel. And I'm assuming that arbitrary panel, even if we were to look at that evidence, had the letter you're talking about. So it just seems to be the order itself isn't infected by looking at other evidence. And I'm guessing if I did look at the other evidence, that letter would have been considered too. That maybe just seems like a frolic and detour that we should only get to if you convince us there's ambiguity, right? I don't believe that there's any ambiguity, but if you believe there's ambiguity, I think it's incumbent to look at the evidence that was before. What about just the, I mean, obviously I was on the Douglas panel, and so right or wrong, it's sort of something legally that, why isn't it plausible that the dispute's covered because the language says any controversy related to an extension, and even if we had the provision saying can't modify without writing, what's an extension? Seems like this could have been an extension from the propane into the CO2. One, the propane to the CO2 is a completely different product. I know you say that, but when we're looking at the language that is the basis for your holy groundless, it talks about extensions and related to. And when it talks about extensions, even if it had been some of this language before the district court, the other documents that lend itself. Put all those aside. Put all those aside. Yeah. Okay. This contract, what the parties agreed, is that it could not be modified absent a written instrument signed by an officer of both parties. But let's say that neutralizes the modification. You still have language about an extension. What did extension mean? What the extension might mean, I do not know. That is for But doesn't that allow plausibility? I don't believe it does when you're dealing with a completely different product. It was not clear how long this contract was going to remain in effect. Is it a completely different product? I thought you'd help me with this. I don't know. I use the product. It's a great product. But you've got the base chemical, and I thought you were just changing the propellant. That's correct. And because you were changing... I'm still using WD-40 chemical to do all those wonderful things with, but I'm now using perhaps I think maybe a safer propellant. You are using a WD-40 product today that operates with a carbon dioxide propellant. Right. This contract was changed with handwritten interlineations, and it was changed to limit it to a WD-40 product based on propane slash butane propelled formulations and specifications. And that is the definition of the product in this contract, and it appears the product as defined some 30 times in that agreement. And I respectfully submit that if you were to read the contract, and everywhere it has the word the product, you were to read instead the way the product is defined, it couldn't be clearer that this contract is limited to this product. And we know, if you turn to extrinsic evidence, why it was limited to the product. Because you see the letter where WIQ tells WD-40, we are not comfortable with your change from propane butane to carbon dioxide. We haven't seen your testing for this. We are experts in filling aerosol cans with carbon dioxide. We know that unless your formula is perfect, you can, rather than creating a safe product, create. Your position, California law governs whether we turn to extrinsic? Is it? Yes. Yes. Okay. And what's your best case under California law as to when we would turn to extrinsic? Just one case that defines it most clearly would help me. Because you are coming back to it, and I agree that creates a bigger orbit of inquiry as to whether the, so what's your best California case for this central proposition? I will try to address it on rebuttal. But I will say that what is before the magistrate judge and the district court judge at the time this decision is made in 9293 is critical. And what is before them is a contract, the 96 agreement that they put into evidence in support of their motion to compel arbitration, and they put it into evidence without Exhibit A and B. There's no Exhibit A and B in the record. You will see in this case that once you get past page 1093 of the record, everything after that, which is virtually everything in their statement of facts trying to create a plausible argument, was not before either the magistrate judge or the district court judge at the time this case, most respectfully, went off the rails. But the district court judge didn't rely on that. I know it's a strong argument you're making, but I'm asking you just to tell me why the language itself doesn't lead to plausibility. The district court judge issued a one-paragraph opinion. Right. The language itself, what language is Your Honor suggesting? Well, any controversy related to any extension of the agreement. That's the language. There was no extension of the agreement, because the agreement could not have been extended without a written instrument. It couldn't have been modified. I know I'm quibbling, but those are words. It couldn't be amended or modified. Let me ask you a question, and we go back to the — you have a — this relationship and the parties, you basically are taking the chemical and — you're a packaging contractor, I would call you. And then — so you're operating under — you get the basic chemical formula, I guess, and then you add — and you all take that and you add the propellant to it in your manufacturing process. And that was butane propane. And at the time you had butane propane, you had this language of limited — the products here are the WD-40 with a propane propellant. Was there any other type of propellant being used at the time? All WD — No. The propellant used at the time was exclusively butane protein. It was clear that — So then there came a point in time when, probably for very good reasons, you got away from that propellant to carbon dioxide. Yes. Okay. Now, so you're still putting the packaging — you're packaging the product for WD-40, and it goes out for sale. Now, you continued under that basic contract. I mean, you continued on the same semi-lines, so you're not just using different propellant. That contract had nothing to do with it. We continued under the same practice we have been operating under since 1960 in dealing with WD-40. This relationship of packaging this product with them goes back to 1960. But everything remained the same in terms of product production, et cetera, and your relationship except using a different propellant. Yes. And the 1996 agreement becomes superfluous. It's meaningless because it is limited to a propane-butane product intentionally. And there is not a single document in this record that demonstrates that anyone ever thought that the 1996 agreement was in effect after propane-butane was — Let's go back to the — divide the time between propane and carbon dioxide. Going back to the original production of propane, were you at that time packaging any other chemicals in relationship with WD? Your Honor, I know that WD-40 isn't just the WD-40 that you and I know from our garage. I know. I realize that. That's why I'm asking this question. There are a wide range of other — There were a — my surmise was, and that's why I'm asking the question, is that in that first time period, there were multiple products. Yes. That you were operating on. Yes. So that you — when the language appeared that it was arbitration, it would agree an owner to this particular product line. Yes. And that product line was the aerosol-disposed — dispensed WD-40. I mean, they also sell it in three-gallon jugs or something. Yes. So, going back to 1960 — So that gets me to where I'm going to focus on for a moment in terms of the continuation of the product. The limitation at that time, the arbitration was to only serve the purpose of dealing with the WD-40 aerosol cans as they existed at the time. You continued thereafter to produce, although that now had a different propellant. That's correct. Okay. There came a point in time where I — Okay. My question is — goes to the plausibility, then, of whether this agreement would identify a particular product line that changed in part, but is still the product. You had multiple products. You IDed the aerosol can. The aerosol can still goes out there, except with a different propellant. In other words, it was just descriptive of the product at the time — one of the features of the product at the time. It continued. Why did that set up a plausible argument with regard to arbitration? Because the — although there were multiple products prior to the 1996 agreement, it is clear. And it's clear based on the 19 — But that was the only product — that was the only aerosol propellant you had at the time. It may or may not have been. I'm not sure about that. But I do know — Well, that's what I'm talking about. This is a two-time period. You have the time period when you had the original propaned dispensal, and then — so when you identified — you identified that product line, then later, you had the — you changed the propellant in the product, but otherwise the product remained the same. The chemistry hadn't changed. The product hadn't changed. It was purely the method of dispensing it in a safer way. Because of the difference in the way it was propelled, the difference between butane and protein and carbon dioxide, that scientifically was a major change for a manufacturing company in the manner in which this product was being manufactured. That's why a month before this — Well, help me with that. Put some more flesh on that. What do you mean it was a major change in terms of the production? In the way it's produced, what the components are, and how it's going to be — come out of the can. You're dealing with something, protein, butane, where carbon dioxide is meant to be an improvement. Yet at the same time, because IQ was not satisfied with the level of research that had been provided to it by WD-40, because we're required to follow their specifications, there is a letter sent out one month before that says, WD-40, you have a choice. Either we will hold off on entering into this 96 agreement until you can satisfy us that you have met the safety standards for changing the carbon dioxide, or we can limit this contract to propane-butane. And that is what is done. That's why on its face, the product — the complaint deals with nothing but carbon dioxide-based propellant. That is why this on its face is clear, that this can't relate to this. And the problem here is that when the magistrate judge first got it, she saw the arbitration clause. I don't think she — she didn't, in her memo and recommendation, she mentioned the holy groundless standard, but she just saw the arbitration clause and did not even mention the definition of product in her decision. Let me ask you something. During this period of time where you're experiencing the market with the flammability of the product, in other words, you spray WD-40 to loosen a bolt on a hot engine and boom, that kind of thing. In other words, there was a phenomenon of flammability with the whole range of hairsprays and you name it. It's a serious problem. I just don't know if there's a safety concern or what. The safety concern is exactly what led to the limitation in the contract. The safety concern? The safety concern is that if you put too much carbon dioxide into the can and it is over-pressurized, the can will deform. And if the can is subjected to certain temperatures, which it could be in the back of a trunk, in the south, in the summer, it becomes a bomb. And that is what IQ was afraid of. And IQ, because they specialize in this, they don't just do it for WD-40, they have their own line of products, they manufacture products for others. The engineer who is in charge, who is in court today, he recognized we are not going to fill these cans with carbon dioxide until you give us specifications that we are comfortable with. That's my question. That's helpful. And that's why it was so limited. Thank you, counsel. Your time has expired. Good morning, Your Honors. May it please the Court. David Noonan, appearing for the defendant and appellee, WD-40. Let me start by responding to the question. The product was a propane-butane propelled product for many years. By the way, it wasn't a bomb. No one has ever been injured by the WD-40 product. In 1996, WD-40 decided that it would change the propellant. So the propellant moved from propane-butane to CO2. And that changeover occurred, as far as the United States market, in July of 1996. Was that a safety concern? One of the concerns was safety. There had been an incident in 1993 involving a propane-butane product that had come in contact with a hot water heater, and so it was, in part, based on safety. So it's plausible, then, that they're talking about the arbitration clauses. It's confined only to the original product and not to the new product, if they could. Well, first of all, to distinguish, and it was a pleasant coincidence to hear the Archer and White case was here before us this morning, to distinguish this case from the Archer and White case. In Archer and White, there were specific carve-outs or exclusions within the arbitration provision itself, such as claims for injunctive relief, trademark, things like that. That's in the arbitration clause. The arbitration clause that's before Your Honors is a standard form, triple A, all disputes, all controversies and claims relating to or arising out of the agreement, but it goes a little further and says, and any modification or extension thereof. So in this particular case, we don't have what they had in Archer and White. The argument that IQ ---- to affirm Archer and White and affirm this case. I want to make sure I'm on the right side of consistency. Don't worry about it. Reverse in Archer and Affirm here. I'll rely on you. You have to be cautious. Yes. Before you get off that larger observation, and I'll just half a minute of your time, what's your own gut feeling on the viability of the Holy Groundless Rule? I understand the policy and the reason behind it. I guess ---- And you're embracing it here. You win. You say on it, but just ---- Correct. But you've recently ---- 2017 Tenth Circuit says it's wrong. Any ---- I agree. They do say that wrong, but I think that the Holy Groundless exception, as it's been defined so far within the circuit, is so narrow. I think Your Honor used the term earlier, common sense. I think you can define it more by what it isn't than what it is. It isn't holy groundless if it's plausible or if it's legitimate or if it's colorable. And if we took the case in which it was applied, more specifically the Douglas case, I guess you can ---- and I don't want to make new law here. It was obvious when you looked at the facts. There's an obviousness. But what if California says law, and you may tell me it doesn't, that for under California law, you've got to look beyond the language to what they were negotiating. So let's look at the March 12th. Suddenly it may become, their argument is, more obvious that no one contemplated the arbitration clause would extend to the CO2. You probably have multiple answers to that. I have multiple answers. Does California oblige us to and does the Douglas test allow us to? I don't think that there's ---- I don't think the Douglas test allows the court, under the facts and circumstances of this case, to do what was called in the Cabala case as a close contract interpretation or to do a deep dive into the contract and the claims. I think the case said, I think Douglas or Cabala said it's not to be used as a license to prejudge arbitrability disputes that by contract have been left to the arbitrator. Now let me go back to California. I haven't really looked at this case as a parole evidence type case. The parole evidence rule in California is that you can offer extrinsic evidence if it supports an interpretation of the agreement of which the agreement is reasonably susceptible. But I'm fine with the March letter. What happened in this case was that the kickoff for the manufacture of the CO2 propelled product wasn't there yet. In March IQ said they wanted to be on board. They wanted to be a continued assembler and packager of WD-40 products. They had not as yet seen the specifications. They had not as yet discussed pricing. So when the contract was signed, that was the state of affairs in April of 1996 when the contract was signed. But subsequently, and again, in for a penny, in for a pound, if you want to go extrinsic evidence, what's in the record is in May of 1996, IQ sends a letter to WD-40 saying we've now done our own testing. We've seen your specifications. We're ready to fulfill your needs for the manufacture of the CO2 propelled product. Was that before the district court and the magistrate here, that May correspondence, or did it get a little blurry? On the first time around, it was not. But, and again, this point that Your Honor should only consider the evidence that was before the magistrate back in 2012 I think is terribly wrongheaded. On the motion to vacate that was filed, which is the subject of this appeal, IQ suggested to magistrate Judge Johnson and to Judge Gray that in light of Douglas, the court needed to conduct a wholesale new examination of this whole holy groundless issue. And then they put everything in the record. And we responded, the motion to vacate, by putting everything in the record. They replied. They didn't say we object. Judge Gray, you can't consider this. They said, you know, it's nonsense. You should accept our evidence and not their evidence. So there was never any objection in the lower court. And I'm raising this because the first time this argument was raised in this case, that this court is confined to the evidence before the magistrate, was in the reply brief. It wasn't even in the opening brief that IQ filed in this particular case. But just confining ourselves to the 1996 agreement, it did, there were initials limiting it to the first product, if we can call it that, and then there was an integration clause. Not entirely correct. What the interlineation was in Recital A, and under California law, a statement in a recital can't trump a statement in one of the covenants in the agreement. But it was a recital that simply said it identified WD-40 as engaged in the marketing and sale of a penetrating lubricating spray product identified and labeled as WD-40, and the interlineation was based on propane-butane propelled formulation and specification. That was a true statement at the time it was made. They keep saying that the interlineation was this agreement is limited solely or only to the butane-propane propelled product. It doesn't say that, and that's not correct, because we know that at the time the contract was entered into, IQ was also assembling and packaging other products that were not propelled, such as the bulk product that we've talked about, and there were other items that were all listed ultimately on these exhibits A and B. But I think the bigger point is this is not a static contract. If you look at paragraphs four and six, it was set up in a way that in paragraph four, the component parts that the packager needed to purchase and the price at which those component parts would be purchased could and the price could be changed on 30 days' notice. If you look at paragraph six, and this goes to the integration clause, it's the other side. The assembler or packager such as IQ could change the price or a product that it was willing to sell back to WD-40 after it had completed the assembly process. So what you had was a mechanism built into the contract whereby the products could change, the prices could change, the component parts could change. And what happened was in May of 1996, we're on board, we're ready to go. In the record, there's negotiation of the price. IQ prepares and exhibit B. It's in the record. They send it to WD-40, sending forth the prices at which they were willing to sell the CO2 propelled product. And then the parties went on for 15 years with no suggestion ever that there was no contract covering this. And, in fact, as the arbitrators eventually said, well, first of all, this interlineation is not unambiguous in any way, shape, or form. And it becomes very ambiguous when you consider that other products were being packaged at the same time that were non-butane propane propelled products. And the claims in this case involve not simply CO2 products. They involve bulk products, bulk products that are sitting today still in the IQ warehouse. But more importantly, what the panel found was that during the course, the parties would say, here's a price change, and one side would say,  That went on all the time. So, and under California law, one of the principles of interpretation or construction that is entirely appropriate is to look at the conduct of the parties. How did they perform in the 15 years before the time any dispute arose? There's a provision in this contract. Again, it's a multi-page contract. And the magistrate judge, when she looked at this, she said basically that the party's dispute regarding whether this case should proceed to arbitration centers on issues of whether the arbitration agreement is still in effect, whether the party's disputes fall within the scope of the arbitration agreement, and whether the arbitration agreement remains valid. These are complicated issues, and they were complicated issues. But what they found, for instance, was in this contract, there's a covenant not to compete. IQ can't assemble a competing product without the permission of WD-40. What happens during the term of the contract? IQ goes to WD-40 and says, We want to package a competing CO2 propel product. They ask for permission, and they got it. So what the panel found was, in addition, in construing this agreement and seeing what it said and what it didn't say, they said, Well, for 15 years these parties conducted themselves. And I think the term they used was the parties, it was unmistakable that the parties conducted themselves as though they were bound by the 1996 agreement. So there's a tension then between what California law allows and what Douglas allows. In other words, you may be right. I'm sure we're going to hear a rebuttal, but the California law says if you've got a reasonable interpretation of the contract, you look at what they did. But that seems to be just inherently at odds with what Douglas allows courts to do. It has to be an obviousness. My view, our view of holy groundless, it's got to be obvious. It's got to be obvious because once you go beyond that, and if the theory is that there's a valid delegation clause, that means the parties have contractually delegated that access to or that question to the arbitrator. So you're undercutting the party's agreement. More importantly, in Douglas, what the court said was it would be a waste of resources and futile to send a plaintiff to an arbitrator on that issue just to be flatly told. They use the term flatly told that there's nothing there to arbitrate. But it's sort of the obscenity standard. You know it when you see it. I was quoting Potter Stewart to my partner, Mr. Boyer, last night. You know it when you see it. And in this case, when Magistrate Judge Johnson and Judge Gray sent IQ to arbitration, we agreed on the appointment of an arbitrator, Judge Sunvold, to determine the gateway issue of arbitrability. And rather than flatly telling them there was nothing to arbitrate, he found that all disputes in the case, all disputes in the case were arbitrable. And then when IQ objected to Judge Sunvold hearing the merits, we got a new three-judge panel. And as quoted in our brief, in their final decision, they said fully three-quarters of the record in this case was spent on an issue that IQ has lost and lost and lost again, arbitrability. So rather than the result that was forecasted by Douglas in a case of obviousness or wholly groundless, the exact opposite is true. Every judicial officer who has looked at this issue since it first arose has agreed not only is it plausible, but that WD-40's claims of arbitrability are correct. And I want to point out one thing. To stand here and say that it is wholly groundless is inconsistent with the positions that IQ has previously taken. When this issue was first sent, this was for the initial ruling re-arbitrability to Judge Sunvold at page 1622 of the record. IQ stated, IQ believes that no more than two issues are arbitrable. One of these issues is whether, as WD-40 contends, the 1996 contract, which includes an arbitration clause, entirely superseded an earlier agreement between the parties of defense and indemnity agreement, the 93 contract. The second issue is whether the parties modified the 1996 contract. This goes right to the question, whether they modified the contract to expand its scope to cover WD-40s that used CO2 as the aerosol propellant. They repeated that in the motion to Judge Sunvold for a reasoned opinion, and then in the district court's decision affirming or confirming the arbitration award and denying the motion to vacate, footnote 2, page 1381 of the record, it states, excuse me, this is IQ's motion to vacate in the district court. Footnote 2, in the arbitration proceedings, states IQ ultimately agreed to arbitrate its request for a declaration that IQ is entitled to indemnity for carbon dioxide propelled products under the 1993 indemnity agreement. Accordingly, the arguments in this brief do not address that claim. So they have, before they got to the reply, got here today, early on in this case, asserted that there were issues that were in fact arbitrable because they arose out of or related to the 1996 agreement. And that is entirely inconsistent with any test of holy groundless, whether it's obviousness or some other measure of that. So to say that some, and that's why the magistrate said we've got to send this to the arbitrator. We have to have the arbitrator determine what's within the scope of the arbitration clause in this case, which again, as I started off by saying, is a broad form, is a standard AAA clause that doesn't have the specific carve-outs and the exclusions. I understand it's a different argument in Archer and White because you had the parties negotiating and agreeing to a separate agreement. So this agreement was fluid. These exhibits A's and B's changed throughout the course. And in the end, what they're asking you to do is to throw out the baby with the bathwater. They're saying we want you to judge this case solely on a little slice, what did the magistrate see in 2012, and if we went on that, we want you to throw the whole thing out. Well, I think that's wrongheaded. I think if it shouldn't have gone to the arbitrator to determine the gateway issue involving arbitrability, it would have gone to the district court. And what did the district court say? The district court has said in its order, and I'll rely on the site and the record, it said this court has previously addressed and rejected IQ's claim that the 1996 agreement covered only butane propane propelled products. So Judge Gray, who is the alternative to Judge Sunvold determining the arbitrability issue, Judge Gray himself has stated that IQ's argument that this agreement was limited solely to certain products is wrongheaded, rejected it once before back in 2012, and he rejected it once again when this matter was most recently before him when it confirmed the arbitration award. So with that, Your Honor, unless you have any questions of me, I'll take my seat and listen to rebuttal. Thank you very much. Thank you, counsel.  Thank you, Your Honor. First, with respect to California law, I direct the court to Moret v. Vannucci, California Appellate 64, California Act IV, page 904, Fourth Department, 1998, which stands for the proposition that the failure to receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning constitutes reversible error. Now, the Judge Gilstrap and the analysis that he did in the Archer case is precisely what was lacking here by the district court judge, which most respectfully issued this opinion, this one-paragraph opinion in 1993, with virtually no analysis, and simply adopting the magistrate judge's finding that there was a case that had to go to arbitration without even analyzing the definition of product, only looking at the arbitration clause and sending it. And the problem is, once that happens and the case actually mistakenly gets sent to an arbitral panel, everything else that comes up afterwards from the arbitral panel back to the magistrate judge and back to the district court gets evaluated under a completely different standard. It is afforded a level of deference that is defined by the U.S. Supreme Court's decision in, I believe it's First Union, Union City, it's the Supreme Court case from 1995, John Higginbotham knows what I'm referring to, and that is the standard that Judge Miller cites in his decision three years later affirming a finding of arbitrability. So it's a completely different standard. So what you have here is a situation that once you, once a district court judge, who is the gatekeeper under Douglas, does not get it right and does not interpret a contract which is clear on its face appropriately, and you slip into the world of arbitration, as a practical matter, you will never recover, because the standards required to overrule what an arbitrator has determined is a standard that is so much higher and so much difficult to attain. Now, this is a contract that was fluid. And, yes, every three months, or every so often, there are going to be updates to the pricing list. But if you look at the updates to the pricing list, and I'll direct you to the record to pages 1716 through 1719, there are new pricing lists for carbon dioxide, but you will see no reference to the 1996 agreement in any of these documents, because the 1960 1996 agreement was never referred to by the parties again after the product was switched from protein butane to carbon dioxide. In fact, when you look at the WD-40 new carbon dioxide pricing in the record at 1718, you don't see Exhibit A or Exhibit B on this, because it's not an exhibit to the 1996 contract, which no longer exists. This is consistent with the practice that the parties have been engaged in since 1960, and the parties completely abandoned, never referred to, and the 1996 agreement, which is the only arbitration clause at issue in this entire 60-year, almost 60-year relationship between the parties. That's the only one. Roberts. Was Murray cited in your principle? Probably not. It was responsive to my question, right? Yes, Your Honor. Oh, wait a minute. It was. The reason I'm asking is just with little time left, how — explain to me just quickly what you're offering that case to say. Would it be reversible error for a district court conducting a Douglas inquiry to not now look at the three years of evidence presented to the arbitrators? I think it would be a mistake to look at the three years of evidence. I think you — But I thought you're citing Murray to say it's reversible error if you don't. If you don't look at the extrinsic evidence that was before the magistrate judge and the district court judge in 92 and 93 when the key determination that sent this case off the rails was decided. That is, you need to look at that March letter, which is entered into one month before the 96 agreement is entered, because it clearly shows that the entire reason for the handwritten interlineations is to limit this contract to propane-butane until the parties can agree that there is a manner of filling these cans with carbon dioxide that is satisfactory to IQ. It is limited to that, and that letter, which is the only piece of extrinsic evidence which is relevant and which is before the Court in 92 and 93, must be considered. All of the other evidence isn't before the Court, and once at the time. And then when it's later thrown in and the arbitrators get a chance to look at it, what a litigant like IQ is forced to do is then try to have an arbitral panel's decision overturned based on a completely different standard, which is almost impossible to meet. Thank you, counsel. Your time has expired. Thank you. Thank you very much.